Please record my name. Hold it down just a tad, thank you. Is that clear? That's better. My name is Bessina Fabenloom and I am here on behalf of the petitioner Ismael Sandoval. Is your last name, what is it? Fabenloom? Fabenloom. Fabenloom. Sorry, I have an accent. Okay. That's fine. We all do. That's true. Fabenloom, is that correct? Yes. If it's not, don't use it. That is correct. Okay. I would like to reserve five minutes for a bubble. Okay. The critical issue in Mr. Samadov's case is that there is no evidence whatsoever that ties Mr. Samadov to any of the evidence that was presented. As we heard earlier, Mr. Yusupov has admitted that he was responsible for fueling an accident in which he accidentally downloaded the video clips that were of interest. Did he say accidentally? He said he accidentally downloaded them. How do you accidentally download a video clip? Because he viewed them and didn't realize there were mirror copies of those files or what she said. You've done it to the computer? I've seen a lot of things. I just went to my daughter and got my iPod. It's very easy. You can't do it by accident. I said, go ahead. Before you even get there, is there anything you wish to add to the discussion we had with respect to the standard that we should apply? There is. There is clear congressional intent here to implement U.S. obligations under the Refugees Convention. The Supreme Court held in INS V. Steddick and in INS V. Cardoso-Fonseca that in enacting the Refugee Act of 1980, the government clearly, Congress clearly intended to implement U.S. obligations concern withholding of removal and asylum. Do you think it's a probable cause standard for reasonable grounds to believe? Forget the is versus may for a second, but the level of belief, the level of certainty is equivalent to probable cause or is probable cause? The is versus may factors into the level of evidence that's required. I was thinking about it for myself when we have Congress's case. May, I can't, if they say get my head around that, I don't understand how it could be may. So let's assume this is, maybe we're down on that. Is it probable cause, the rest of it? It would be consistent with probable cause if that means that what is required is specific, probative, reliable evidence. Well, enough evidence to cause a reasonable person to conclude that this person is a danger to the security of the United States. Security being economic, the three things that are set forth. There are two principles that guide that. The first is that going back to the Refugees Convention, it is clear that the drafters of the convention intended this to be restricted to rare circumstances. So in trying to understand the level of evidence required here, we need to start from the position that this was not intended to sweep up large numbers of people who may be tangentially connected to some piece of evidence that is not specific, probative, or dangerous. That's why I took May out of it completely. Can we go over, you said at the outset that there is no evidence which would justify this decision by the BIA, correct? Involving your client? I said that there is no evidence that connects Mr. Samenov to any of the pieces of evidence relying on by the BIA. Let's forget about Uzbekistan, the Interpol, let's forget. Put that aside. I read your brief. What about the video clips of speeches by Muslim extremists, Osama Bin Laden, this fellow from Chechnya, they got this off of a shared computer in part purchased by your client in a house in which your client's name was on the lease, correct? That is correct, but it's not that we don't know who had access or who downloaded those video clips. Mr. Yusupov admitted and IJ credited in his proceedings that he was the one who downloaded the video clips. Mr. Samenov has nothing to do with them. Two of his colleagues fled, detection by the authority of the United States, correct? That is not correct. That is not correct. There was no evidence in the record suggesting that either of them fled. With respect to Mr. Zakirov, even the immigration judge conceded, this is one thing I would like to correct from the previous proceedings, Mr. Zakirov was not granted asylum. He did not flee to Canada. He did not flee to Canada, he went to Canada. And Mr. Zakirov was actually not granted asylum, he was granted withholding. And the IJ said in Mr. Samenov's case that we don't know why he went to Canada and it One of your client's roommates received an email referring to a big jihad, correct? It's correct that the word jihad was referenced in an email to someone else. But the critical point here, Your Honor, is that it wasn't sent to my client. My client has nothing to do with this email. The BIA, in reversing the BIA, agreed with the IJ's adverse credibility determinations concerning Mr. Samenov, correct? That is correct. But on that point, the IJ's credibility findings were not based on substantial evidence. The BIA found particularly compelling the IJ's determination that your client was not credible as to testimony, as to the money sent back. He originally did not tell them about the $3,000, is that correct? That is correct, but it was unreasonable for the IJ to reject my client's explanation of the discrepancy. As he explained in the later testimony, the reason that he did not mention the debt repayment was because he believed he was being questioned about charitable donations. And then when my client, as a non-English speaker, asked if he could ask a question to clarify, the immigration judge said no, and that was in the context of questioning related to money sent back to his family. But as the IJ put it himself, and I want to quote, Samenov affirmatively attempted to mislead the IJ in his responses about money sent back to his home country. The IJ's conclusion in this regard was found not to be credible on various factual issues and weighed heavily against his argument that he had overstayed his student visa for an innocent reason. Is that correct? There are two reasons why that's problematic. The first is that the IJ's credibility finding was not based on substantial evidence, and the BIA's decision was in error in holding that the IJ's decision was based on substantial evidence. Mr. Samenov never had an opportunity to clarify the questions that were being asked of him, so to assume that he was deliberately lying was fundamentally unfair and had no basis in the record. So when you started to say a few minutes ago that Mr. Samenov tried to clarify something, I guess this pertains to the money was asked, he asked if he could clarify something, the IJ said no. Was that the first hearing or the second hearing? That was at the first hearing. And that was the same exchange when he was asked about sending money and charities, he said no, and then he said... It was when he was then questioned by his own attorney, after the government attorney had asked him about the money, and in the course of that he said, I only sent small amounts, and then his attorney questioned him and said, did anyone in your family ask you for money? And he said, no. Could I ask a question to clarify? And the immigration judge said, no, you only answer questions asked of you, and there were no further questions asked of you. Where is the transcript of that? Do you know if you have it? We'll have some time to go over it. If you can find that in the transcript, that would be very helpful. Because it seems to me the sequencing of that could be crucial. If he asked for an opportunity to clarify a question which, on its face, you couldn't simply say, if I'm sending money back for a debt and I wasn't asked for the money, and I'm asked a question, did you send money, were you asked to send money back? And you say, no, well, I wasn't asked, but I did hope it brought me some money, and then you say, can I clarify that? Anyhow, you get what I'm getting at. If I know where that transcript is, that's helpful. Sure, Your Honor. The other important thing to bear in mind here is that the government did not dispute that the money was sent to his brother. It wasn't sent to some unknown individual or organization. It's arguably the brother's a conduit for somebody. So the fact that it went to the brother, I mean, it does help when it's not going to an organization the government's concerned about. So it helps somewhat, but it doesn't help as much as it could if the exchange took this clearer in context, because arguably the brother's a conduit for an organization. So it seems to me the extent to which the record reflects an attempt to clarify a question which in hindsight was somewhat misleading and ambiguous and was not afforded that opportunity, that could be a real adversity in terms of the credibility finding, it seems. Yes, Your Honor. The other important point to bear in mind here, though, is that the credibility determination should not have affected the inferences that the BIA drew from the particular physical evidence. If we look at the computer evidence, the files were admittedly downloaded by Mr. Yusupov. The email went to Mr. Zakharov. The government couldn't attribute the map to anybody. And Mr. Samadov's testimony doesn't affect any of those facts. And then we know that the Interpol notice and the extradition request were inherently unreliable. So whether or not the immigration judge found Mr. Samadov credible on the money doesn't actually go to any of the reasons why the BIA found him to be a danger. Did you say immigration judge for a second? It was. May I move over just once? You wrote the brief in the immediate case as well, did you not? Yes, Your Honor. The point that you made about the UNHCR book was that it should be utilized in dotting the I's, crossing the T's. At no time do you cite a query versus a query, a query, a query, excuse me, not versus a query, in which the highest court in this land said the UN handbook may be a useful interpretive aid, but it is not binding on the Attorney General, the BIA, or the U.S. courts. Isn't that correct? That is absolutely correct, Your Honor. We do not argue that the UNHCR's view is binding on this court. However, given the clear congressional intent to implement the convention, we must look to the convention in terms of understanding what the provision means under U.S. law. For what reason? For what reason? For what reason do we look to the convention? If the Attorney General, who after all is an officer of the United States, is this correct? Yes, Your Honor. If this is where he comes down on, why do I have to look at the UN handbook? Because the Attorney General is still fettered by congressional intent. The Attorney General can't pass any interpretation. It has to be consistent with clear congressional intent. Is it a permissible interpretation? I'll go back to my conversation with Mr. Rudnick. It absolutely is not. It is not a permissible interpretation. The Attorney General's interpretation is not permissible, given clear congressional intent to implement the Refugees Convention. So you will not afford Chevron deference? No, Chevron deference is not due on the first step of Chevron, because Congress's intent here is clear. There's no ambiguity as to whether Congress intended to implement the convention standard or not. First, I need you to get to the second step. The A.J.'s interpretation is not a federal deference because it's not a plausible interpretation of the statute. You're saying one stop at step one, but if you go to step two, this is not Chevron because of the nature of the interpretation. It's just too inconsistent. There's too much tension there with the text of the statute, and therefore you don't get to step two. But if you get to step two, the A.J.'s doesn't get a federal deference. That's correct, Your Honor, and as a charming Betsy, there's an obligation to constructs consistent with international law insofar as reasonable. That's an oldie but goodie. Has that been cited recently? This 18 or 1897 case, something like that, has that been cited? There are sites in our briefest cases in the 80s and 90s in which it was cited. I've got the correct marriage partner, and I apologize to you, Mr. Rudnick. The administrative agency found that this was not a bona fide marriage one month before the hearing was to take place, correct? I don't believe it was one month before the hearing. I believe, I'm not sure of the actual date, but correct that it was not found to be a bona fide marriage. What is your reaction to that finding? There are three parts to my response to that. The first is that that decision is currently under appeal. But more importantly, there is nothing to say that the fact that that marriage is not bona fide has anything to say about Mr. Samadov's dangerousness. In fact, if we look at the fact that Mr. Samadov believed he was going to be tortured if he was sent back to Uzbekistan, if it's true that it was a sham marriage, surely a person who's going to be tortured if they're removed would want to stay in the United States. There's nothing to say that he wanted to stay in the United States to inflict some kind of harm. Let me ask you a question about danger and going back to, you said that we can't, that the Attorney General cannot go against clear congressional intent. And you mentioned on page 17, let's see if we can tease that out a bit, you mentioned on page 17 of your brief that there is an expression of clear congressional intent with respect to the word danger. Where has Congress addressed the word danger? Congress has not specifically addressed the word danger as it relates to this provision. In Sale v. Haitian Centers Council, the Supreme Court held that, in particular, this provision was intended to implement U.S. obligations under Article 33.2 of the Convention. So there's no doubt that what Congress was trying to do was to have this provision be coextensive with U.S. obligations under the Convention. And unlike the case of Aguirre-Aguirre, where the interpretive materials were actually unclear as to what the Convention meant in that case, in this case, the interpretive materials are unanimous and extremely clear about what that term means, that it should be restricted, it should be read narrowly, and it has to be a significant threat to the country. It can't just be any danger. Before you sit down, just one other question. You close your brief by asking for a remand to the BIA to determine the asylum claim on the basis of changed circumstances. What circumstances have changed? Since that was decided, the circumstances related to the Interpol notice occurred after the first decision in the IJ on the second set of proceedings found that there were no changed circumstances because the Interpol request was the same as the extradition request. However, there's testimony from Human Rights Watch that was credited by the IJ saying that this is now, everything is now significantly worse. What Mr. Potter referred to, that the credibility being given to the Uzbek government is at least being questioned by one department, the State Department. That's correct. And since those bombings of 2004, it's clear that persecution of independent Muslims has escalated and the IJ credited the Human Rights Watch testimony on that point. Thank you. You've got some time coming back. Let me try with you while I didn't get too far with your colleague. Is there no set of assurances that you could think of that if they were received by you, would build in enough protection against your client going back to Uzbekistan under this or a similar kind of regime that would keep you from trying to move down that avenue with Mr. Potter? It seems eminently reasonable. Well, first of all, in terms of- I understand he's not calling all the shots here. I think that is the key point, that a litigation position is not binding on the government. And if the Attorney General changes in one year or five years or ten years, we don't know what's going to happen with the Uzbek government. We don't get another chance to come back on the petition for review and say he's not a danger to national security. So he is vulnerable to being sent back on diplomatic assurances at any point that the government changes its mind. I had a contracts teacher in the first year of law school who believed and would have bet his life that any legal problem that doesn't apply to the IRS can be resolved through cover and a reasonable drafting. And that's not for us to decide. We're here to decide. I don't have questions on the law, but I argue especially with the IRS. And the bigger problem here is that whatever standard is set in this case is also going to apply to other cases. And not everyone who is found to be eligible for withholding on persecution grounds also gets cat relief. It's possible that a person could be persecuted but not tortured. And therefore, those people really are vulnerable to being sent back to clear persecution. I'm really just focused on this case right now. I understand that, Your Honor. But in discussing the standard in any way, this is going to affect other cases where individuals do not have the benefit of cat protection. We deserve some time. Thank you. May it please the Court. Jonathan Potter on behalf of the Attorney General. If you could, maybe you could pick up where we left off. Yes, Your Honor. The particulars of Mr. Saminoff's case. We talked about whether there is a probable cause in terms of a reasonable grounds to believe versus a reasonable articulable suspicion. But the one case that we have that deals with some of this a bit is the First Circuit case in Adams. Yes, Your Honor. And on page 649 of Adams, the Court said, Thus, reasonable belief may be formed if the evidence linking the alien to terrorist violence, and they use the word terrorism, and let's just take it out for the moment because this may be less than just terrorism, than just terrorism. If the evidence linking the alien to terrorism violence is sufficient to justify a reasonable person in the belief that the alien falls within the prescribed category. Is that something you can live with? Your Honor, I don't think we have to get to that level. I think a reasonable suspicion. Adams is even a greater standard than the statute calls for in this case. It is because... Adams is all the more closer to a probable cause than we believe that a reasonable grounds isn't quite that high a level. We don't have to have a higher level to send somebody back to be tortured than to exclude them from coming in knowing they're not going to be tortured in the country where they currently are. Wouldn't the former require more scrutiny than the latter? Your Honor, you're looking more... You're not looking towards the threat to that individual in analyzing this because as I've already discussed, the DHS's view of this statutory scheme with the torture convention there is that everybody's covered no matter what. So what we have to look to is the danger to the United States. Okay, so that becomes Adams in your point of view. In that view, yes, as far as what we have to focus on. We're not focusing on the alien at all. He's taken totally out of the equation. For this point... Understandably, they don't trust your assurances, but that is a good argument. And, Your Honor, this goes away, and you just focus on one side of the teeter-totter, is what you're saying. And, Your Honor, one other thing I'd like to address as far as assurances. I am willing to discuss with both petitioners any assurances that we can give. The only problem is I can't find the State Department myself today and say what they will say, but I can surely at least find the State Department as far as them knowing that I'll give them a call and we will discuss it and hopefully can get everybody in the room together. If that's what the court would like, we're more than willing to look at that. I just want to put that out there. The eminently reasonable way to resolve this where everybody is not only satisfied but content and the ends of justice rest fair. We don't risk having someone tortured. At the same time, we're not concerned about a breach in the U.S. security. It seems like... Again, you're not calling all the shots. I totally appreciate that. But if that can be resolved to the extent that understandably skeptical counsel from petitioners would be satisfied with, then it seems like the best way to proceed. If that's something that I'll leave open to them to discuss with me because I'm more than open to discuss it. As far as Mr. Samenov's counsel made an argument that I want to clarify here, she said that Mr. Yusupov claimed that he downloaded all those videos. I want to clarify if you look at the joint appendix from Mr. Yusupov's case at 347 to 348, that is discussed. Now, Mr. Yusupov, I could not find in a brief read of this where he says I downloaded all those videos. But one thing is very clear, that actually is contrary to Mr. Samenov's testimony. At his hearing, Mr. Yusupov says that I watched those videotapes with Mr. Zakharov and with what the... In this record it says Sametov, but I'm sure that's Samenov. So it's clear from that... You've been watching them. You can send them and watch that stuff on CNN. No, that only means something in that Mr. Samenov claimed during his hearing that he didn't ever watch those videos. And counsel today relied on Mr. Yusupov's testimony to remove Mr. Samenov from those videotapes and the adverse credibility determination, which is abundantly supported in this case. And I'd like to address that as well, if you'd just moment, Your Honor. There was part of the record where Mr. Samenov apparently didn't have a chance to retort to the money issue. And I wanted to clarify that. What happened, and this is on the joint appendix for his case at 207... You're talking about the $3,000? The $3,000, yes, Your Honor. If you read that, what happened was he was being questioned. He wanted to say something without counsel asking, anybody asking a question. His counsel was there and never asked a follow-up question. So this idea that somehow he was deprived of his opportunity to present the story is just not true. And if you read the record later... I don't know what she's saying. I don't want to speak for her. But I think what she's saying is that he did try to explain a question which in retrospect was an answer, which in retrospect is misleading, i.e., wrong, and didn't have an opportunity. Whatever it was that was in his mind that he was going to say, he never got a chance. And contextually, it looks as though he's trying to explain that $3,000. That's what she's saying. That's what she may be saying, but if you look later in the record, counsel for Mr. Samudov just doesn't come in and say, oh, we just wanted to explain that last time. Mr. Samudov's excuse on the stand is he forgot about it. And the immigration judge then questions him about that and says, what are the steps you had to take to wire $3,000, which in your country is a huge sum of money, to your brother? And you had to go to the bank. You had to do this. You had to do that. He never says that, and he never says, you know, I would have explained this earlier. He just says, I forgot about it. And the immigration judge, reasonably, I believe, says, how can you forget about something that's a large percent of the income in your country? You have to take certain steps to do this. This isn't something that people do every day. And you only admit to it after you're confronted with evidence that you actually did wire the money. This, along with the I never watched the videotapes, I only went on that computer for e-mail. I leased the home, but I had no idea who the other people were in there except those people that have already been identified. That, in and of itself, calls into question his credibility and supports the adverse credibility determination in this case. You may have, indeed, as to Mr. Samenov, a very good case on the merits. But the question is, what standard do we apply? Looking, going way back to the beginning, it looked as if when we adopted the 51 protocols in 68, that the whole concern was refugees. I get the 51 coming from Europe. The refugees would be given safe haven here. Correct, Your Honor. And we then in 80 had the Refugee Act. Once again, we're concerned, I guess, with the outgrowth of Vietnam, Afghanistan back in the late 70s, early 80s. And it seemed as if the playing field was tilted, if you will, at that point toward the refugee. And there were, the U.N. Handbook would be helpful. Cardozo-Ponsec even goes down and talks about the rule of lenity. If there's any ambiguity, you construe it in favor of the alien. And then in 96, language has changed a little bit. But that really isn't the issue. Something happened since 1996. Obviously, it's 9-11 and a great fear of terrorist activity. And it seems as if there is a desire to have the standard playing field change differently so that it favors national security. National security, obviously, is extremely important. But if you're in our position, how do we go about putting out a standard that is fair to everyone, you and the party who may be sent back to be tortured and or killed? In fact, isn't that a fact that we're locked into the language of the torturing statutes? If I pick up for a second, and it's the answer, I think it's a question that was in my mind. And we just heard one judge legislating for the bench. And it sounds like what we are being asked to do is to view what we have historically done with refugees through the lens of 9-11 and read into subsection 4 of 241b3, language which, given the current context, makes sense, but which Congress didn't put in there. And so maybe Congress should come back and do something with the word danger or reasonable grounds. But the statute is still a statute that wasn't amended after 9-11. I'll give you just an example, just to pick up on what Judge McKee is saying. You say on page 27 of your brief that the standard is met when information that would support a reasonable belief that an alien poses a danger to our national security. But to me, support, that's a building block to get to your reasonable belief. The threshold appears to be lower than what I think Congress intended. Your Honor, I disagree. I think Congress intended... Your argument appears to set a standard lower than what I think Congress intended. Congress intended that a danger... I think that the language is ambiguous for a reason. I don't think Congress wanted to define what a danger was because this legislation has to change. But here, let's assume for the moment, nobody's come up with an example of... If you say non-trivial, and I know you don't want to say significant, which I didn't understand why, because non-trivial to me means significant. But if you say danger without an adjective, and you'll concede that it means non-trivial, I don't know anything that fits between non-trivial and serious. So let's assume for the moment that you're not differing that much. You appear to be differing by saying, if I have a suspicion that supports a belief, or could support a belief, that's all I need. And we're supposed to defer to you, even though this is something that's reviewed by the courts. Your Honor, I think... That's putting us in a tough position. Could is not that. I said may support a belief. And I think it needs to be looked at... Well, may means could, I think. Could be looked at in the context of this case and the prior case. Both of these cases more than may support a belief. I think in the national security context, it needs to be understood that there are no definites. We cannot point to anybody and say you're definitely going to be in danger. Isn't the reason because there are no definites that we're not requiring you necessarily? It seems that there's agreement that you need not have a belief that is by preponderance of the evidence. It still has to be... In Samadov, did not the IJ say, this court finds there are reasonable grounds to believe that the respondent is a danger to the security of the United States? That's correct, Your Honor. And I think that's in view of this case. And I think if you have... What is very decisive in this case is deceptiveness. It's almost tradecraft deceptiveness. You only answer the questions they already have the answer to. But it is important to look at these cases because we cannot... For example, let's just... Jerry Adams is escorted throughout the United States. He's a... Say he would happen to be a monitoring IRA member. He could be a threat to the United States, but not under the circumstances that he came to the United States and was accompanied all the time. There are certain things we can do to make people absolutely not threats. One is detain them and put them in 24-hour detention. There are a lot of things we could do. Let me go back to the Adams test and let's try another variation of it. If the evidence leaking the alien to violence... I'll skip terrorism. Violence is sufficient to justify a reasonable person... Now, this says in the belief that the alien falls within the prescribed category. What if we change that to... Sufficient to cause a reasonable belief that there is something afoot. Can you go along with that? I could, yeah. I think reasonable belief that this person is a... In the threat context... A reasonable belief that somebody is a threat means that there's information that says this person is a threat. It's not... There's nothing. We're not talking about... It's a danger. Well, the DAG in interpreting 1231B3B said, and I quote, information that will permit a reasonable person to believe that the alien may pose a danger to the national security. He said that in AH, correct? That's correct. And that's his interpretation of the statute. And that's a correct interpretation because we cannot let a danger to the national security. This isn't a danger to one community. This is a danger that affects either economics or national security. You're going in the hat there because the question is in terms of the individual may be a danger. And you're answering in terms of, yes, because we can't let someone who is a danger... That's what... May be a danger, yeah. May be a danger. We can't let people... May be a danger. May be a danger. But that's what the statute... The statute that they... You reasonably believe they are a danger. Anyone can move their eyes. Tanks may be a danger. Yeah. Anyone. I'd say attorney generals interpret a danger to be somebody that may be a danger, that we cannot let any person that may be a danger seek this kind of protection. Now, once again, I reiterate that the statutory scheme and the Convention Against Torture says that we can't return people to countries that are tortured, and these people will never be returned to Uzbekistan as long as that current government is in place. Or the alternative is the United States violating a treaty, and I don't think this Department of State or the Department of Homeland Security looks lightly upon doing those kind of things, and I know the attorney general does not. And in making decisions like this, aren't there decisions which hold? Courts are not really set forth to make decisions like this. That's correct, Your Honor. The policy paradigm that overlays this is huge in that courts are not... We don't litigate national... What is a danger to the security of the United States in courts very often. It's not a thing that the courts are not comfortable with, and for good reason. There's a lot of reasons to... But the courts, according to Cardozo-Fonseca, must become comfortable with what the standard is. That's correct, Your Honor, and I agree... The merits can be... It may be a very tough case, and as I said, you may prevail on the merits. But I don't see any way around Cardozo-Fonseca in terms of stating what the standard is. That is not something that... It almost looks like... One could make an argument that, as I said to you during the Yusupov case, that that's almost off-limits to the Chevron issue, when you make the blanket statement that Justice Stevens did there, that it is up to a court to interpret a statute, and that is the sole province of the court. And I really wonder if they really meant that. But it's a fairly tough language. It is what Marbury-Madison said. It's gotten lost since then, actually, Your Honor. It's kind of where courts in New Orleans are. You interpret statutes. You interpret statutes, but in this case, you also have to give that Chevron deference, if the statute is ambiguous. Although usually Chevron deference is given in a case in which the agency has a particular expertise. There's an argument about this agency has expertise in immigration matters. What particular expertise does this agency have with respect to terrorism? Well, Your Honor, I must remind you... I mean, is that a DHS thing? No, it's an FBI thing, Your Honor. The FBI is part of the Attorney General is over the FBI. So that's an important thing to remember. This isn't just the Department of Justice speaking. He is also the boss of those people as well. So he's wearing that hat when he comes out with this language, and that is probably the more influential hat to wear in this circumstance. We have experts on terrorism in the Department of Justice, many of them. We have experts in the FBI and experts in DHS. He's wearing the hat of the FBI. But here the problem appears to be when you get to what the experts do, they went up to a certain point in their investigation, and maybe something has continued on since then, but at least in this record they went up to a certain point and then they just stopped, as if something said to them that there aren't enough red flags for us to continue. Well, that is simply not what happened in this case, Your Honor. But why was there not further testimony from Agent Alexa or the FBI agent with you, Mr. Alexa, at the hearing? Because at that time that was all that they could testify to under certain restrictions that they were under at that time. But isn't that the only thing I can go on with the record? That's correct, Your Honor. But you also have to understand that we're not dealing in a case that just stopped. Okay. And they really never did. I remember one time when I was in the U.S. Attorney's Office and with a big indictment with the U.S. Attorney, he kept saying, look, if you ask any questions, just say the investigation is continuing, the investigation is continuing. Well, it wasn't continuing. But now we get my turn on TV, the investigation is continuing, the investigation is continuing. Sometimes it does and sometimes it doesn't, but the answer is always the investigation is continuing. That's kind of the way to deliver a prosecutor. The investigation is continuing because you never want to give anybody a blank check because you don't know what you'll find out down the road. Yes, Your Honor. But in this case, that was an AUSA before taking this job, and the investigation in this case is continuing. Okay. Thank you. Okay. Thank you. Just trying to respond to the continuing investigation. Thank you. Just a few points on rebuttal. Firstly, I would like to clarify that the reference that Mr. Potter made to a comment by Mr. Yusupov concerning Saminov or some person at Sanitop having watched videos is nowhere in the record in Mr. Saminov's case. Mr. Saminov's counsel never had an opportunity to cross-examine on that issue, and it simply can't be considered in Mr. Saminov's case, especially considering the name wasn't actually Mr. Saminov's name. I'd like to emphasize that the only evidence here, the only connection to Mr. Saminov is guilt by association. The government had the entire computer. It said that it took them over two years to translate all the files on the computer. There were so many. The only things they found were these video clips, the email, and the map. None of those things have any connection to Mr. Saminov. Where were the video clips from? Were they from news stories or what? It's unclear. There were two that were from the Al Jazeera media outlet, and the government could not determine the provenance of the other video clips. But it's important to realize also here that the government didn't find anything in Mr. Saminov's email account, nothing. They pulled this computer apart, and there was absolutely nothing related to Mr. Saminov, and there was nothing that corroborated any of the inferences the government is suggesting from these few files that it did identify. The other point that's important to bear in mind here is that the government never interviewed Mr. Saminov at any point after these computer files were found, and Agent Alexa testified in Mr. Saminov's proceedings that he did not know of any government agent ever interviewing Mr. Saminov about these files. Clearly, the government did not believe that these demonstrated any threat posed by Mr. Saminov. Did you not say that many of these video clips came from either CNN or Al Jazeera? And wasn't that countered? Sorry, could you repeat the question? You said in your brief, did you not, that these video clips came from either Al Jazeera or CNN? Sorry, we do not say that they came from CNN. Some of them came, I believe it was two of them that came from Al Jazeera, and the government could not say where the other video clips came from. The point is made, for example, with respect to the Chechens, that the nature of the video clip indicates that they were taken allegedly on behalf of the people who are constituted the Chechens in terms of their attacks on Russia. Is that correct? It is correct, Your Honor, but firstly, those clips, according to the record in Saminov's case, those clips have nothing to do with Mr. Saminov. He did not view them based on the evidence in the record in Mr. Saminov's case. The government never suggested that he was in any way connected to these files. But secondly, there is a ton of footage of this kind on the Internet, and as the IJ noted in Mr. Yusupov's proceedings, anyone with access to the Internet can view these clips at any time. What sort of smoking gun would you look for? To find that an individual is in danger? Yes, ma'am. What would you look for? In other words, the United States of America, in light of 9-11, is desperately trying to find some evidence. Yes, Your Honor. What would you look for? Here they had the video clips, pictures. I don't know why people take pictures of the state police barracks, all the locations. There were also shots of bridges, other aspects in New York City, of buildings and so on. Those were in Mr. Yusupov's case. They weren't in Mr. Saminov's case. But Samadorp is alleged to have seen these, is that correct? Not any of those other clips. They were not raised in Mr. Saminov's proceedings. Only the ones of Chechen rebels and the video clip of the bin Laden speech. But there's no evidence in the record that Mr. Saminov has anything to do with these murders. New York skyline was Yusupov. Yes, Your Honor. Don't take me to the skyline. That's right, Your Honor. They were living together, were they not, for a while? They were living together. But that does not mean that Mr. Saminov is responsible for everything that he has done. He sees no evil, hears no evil, correct? There's nothing in the record suggesting that Mr. Saminov had anything to do with these clips. So when you ask what smoking gun, if you were in a government's case, would you have interviewed, if you suspected this guy of being a terrorist and having contacted the terrorists, would you have interviewed him after you found out what was on his computer? If the government suspects that anyone has connections as terrorists. You go back and ask him about the translation. I mean, if concerning the e-mail, as we argue in our brief, there are issues with attributing a prejudicial meaning to that e-mail. But if the government really was concerned about that e-mail, one would assume that the government would at least question Mr. Saminov about his roommate, who the e-mail was addressed to. There's no evidence that Mr. Saminov was even asked about Mr. Zakharov. And in Mr. Zakharov's proceedings, he was found to have no connections with extremism or terrorism. In which proceedings? In Mr. Zakharov's proceedings. And I just want to finally comment on Ms. Assurance's point, because it has come up several times. In Mr. Saminov's case, he may otherwise be eligible for asylum here, which is a significantly greater amount of relief than he would get under deferral of removal. You mean, finding him under subsection 4, he may have qualified for asylum? That's right. And so, this decision, the determination of the standard and the evidence will affect his eligibility for asylum on remand. And so, also assuming, even leaving that point aside, I mean, if the Uzbek government doesn't change for 20 years, Mr. Saminov is going to live in this country with a finding that he's a danger to national security, where no such finding is warranted. And as we all know, that is a huge stigma. If he ever wants to get involved in anything in this country, it's basically impossible to function if you're a danger to national security. But this is where I'm going with the finding. The finding was that he is a danger, or the finding was that he may be a danger. Because part of the issue is the standard that shouldn't be applied, the standard that was applied. We would argue that he not only may be a danger, he also is not a danger at all. There's no evidence in the record suggesting that he's a danger. So the BIA, dead wrong in this case, in their conclusions. Based on the evidence in the record? Dead wrong. Yes, Your Honor. Okay. Anything else you want to add? No, Your Honor. We'd like to ask for both cases, both Saminov and Yusupov, to get a transcript, and we can speak with Clerk Ms. Langwood and let you know how to get that transcript. I also want to thank, I don't know if you are appointed or pro bono, Mr. Rudnick, are you retained? I was initially, Your Honor. Okay. You should remember from practicing law, that was a long time ago. I was at government jobs and the checks came every two weeks, not every once a month. I wanted to just, on behalf of the court, thank you. I assume that you are taking this pro bono. Yes, sir. I assume you did not retain more. No, Your Honor. Okay. It's a big help to the court in many cases, particularly his area, and to the firms who do the work, it's hard to overstate how much we appreciate your involvement. I get the feeling, because you were a little bit nervous at the beginning, you haven't done a lot of these. I hope you do a lot more. You're very, very fine. Thank you. Thank you. We'll take a minute with your advisement. This court stands adjourned until Thursday, April 19, 2007 at 10 a.m. Where do you want to see us? In your chambers. It's a mess between the four.  What floor are you on?